## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

---

**THE IPE CLIP FASTENER COMPANY, LLC,**

                    **Plaintiff,**        **Case No.: 8:16-cv-02862-SDM-TGW**

**v.**

**SIMPSON STRONG-TIE COMPANY, INC.,**

                    **Defendant.**

---

## THE IPE CLIP FASTENER COMPANY, LLC'S

## AMENDED CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 3

LEGAL STANDARDS FOR CLAIM CONSTRUCTION .................................. 4

LEVEL OF ORDINARY SKILL IN THE ART .................................................. 7

PROPOSED CLAIM CONSTRUCTIONS ......................................................... 7

   I.      CLAIM TERMS TO BE CONSTRUED ............................................. 7

      A.  "compressive element" and "compression members" ................................ 7

         1.   The Specification Supports Ipe Clip's Construction. .............................. 8

         2.   Simpson is Barred by Prosecution Disclaimer from Recapturing Compression Without Collapsing. ... 14

         3.   Extrinsic Evidence Supports Ipe Clip's Construction. ......................... 17

      B.  "vertical support members" and "support member" ................................. 19

      C.  "pre-cut biscuit slot" ................................................................................ 22

      D.  "center line" ............................................................................................ 30

         1.   "along" said center line of said top element ...................................... 32

         2.   "away" from said center line ............................................................. 33

         3.   "adjacent" the center line ................................................................. 33

      E.  defining engagement surfaces "remote from" the center line ................. 35

      F.  "the engagement surfaces being constructed and arranged to confront vertically-extensive surfaces of slotted boards" and "engagement surfaces confronting the vertically-extensive surfaces at the slotted boards" ....... 36

  II.     INDEFINITE CLAIM TERMS ......................................................... 36

      A.  "a predetermined length to maintain said top element in a predetermined position" ... 38

      B.  "at least partially collapse under a predetermined compressive force" and "at least partially collapsible" ... 39

      C.  "from a top view footprint" and "top view footprint shape" ................... 41

CONCLUSION ................................................................................................. 42

# TABLE OF AUTHORITIES

**Cases**

*AAMP of Florida, Inc. v. Automotive Data Solutions, Inc.*, 2015 WL 6672257, Case No: 8:13-cv-2019-T-35TGW (M.D. Fla. Sept. 15, 2012) .................................................. 5

*Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214 (Fed. Cir. 1996) ...................... 17

*Apple, Inc. v Motorola, Inc.*, 2011 US Dist LEXIS 156969 (W.D. Wis Oct. 13, 2011, No. 10-cv-662-bbc) .............................................................................................................. 27

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006) ............................................... 20

*Brown v. 3M*, 265 F.3d 1349 (Fed Cir. 2001) .......................................................................... 6

*Cablestrand Corp. v. Wallshein*, 29 F.3d 644 (Fed. Cir. 1994) ...................................... 20, 42

*Central Institute for Experimental Animals v. Jackson Laboratory*, 726 F.Supp.2d 1045 (N.D. Cal. 2010) ........................................................................................................... 24

*Computer Docking Station, Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008) ................ 5, 6

*Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) ............................... 4

*Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126 (1942) .............................................. 6

*Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) ............. 38, 40

*In re Oetiker*, 23 U.S.P.Q.2d 1641 (1990) ............................................................................. 40

*Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ............... 6

*Jobdiva, Inc. v Monster Worldwide, Inc.*, 2014 US Dist LEXIS 141096 (S.D.N.Y. Oct. 3, 2014, No. 13-cv-8229 (KBF) ...................................................................................... 27

*Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046 (Fed.Cir.2002) ............................................................................................................... 23, 24

*Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542 (Fed. Cir. 1994) ........................................... 20

*Mahn v. Harwood*, 112 U.S. 354 (1884) ................................................................................ 24

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ....................... 5, 6, 37

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed.Cir.1996) ....................................................... 24

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,  395 F.3d 1364 (Fed. Cir. 2005) ...................... 7

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004) ....................... 5, 27

*Miller v. Bridgeport Brass Co.*, 104 U.S. 350 (1881) ........................................................... 23

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014) ....................................... 37

*Netword, LLC v. Central Corp.*, 242 F.3d 1347 (Fed. Cir. 2001) .......................................... 4

*Nystrom v. Trex Co.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005) .................................................. 4

*Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)............................. 16, 17

*On Demand Machine Corp. v. Ingram Indus.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ........... 5

*PC Connector Solutions LLC v. SmartDisk Corp.* 406 F.3d 1359 (Fed. Cir. 2005)................ 7

*Perkin-Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528 (Fed. Cir. 1987) ............. 20

*Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, 429 F.3d 1364 (Fed.Cir.2005 ................... 23

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ......................... 4, 5, 6, 31, 32, 34, 35

*PSC Computer Products v. Foxconn International, Inc.*, 355 F.3d 1353 (Fed. Cir.
2004).................................................................................................................. 23

*Randall May Int'l, Inc. v. DEG Music Products*, 378 Fed. Appx. 989 (Fed. Cir. 2010).. 20, 40

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998)................... 6

*SanDisk Corp. v. Kingston Technology Co., Inc.*, 695 F.3d 1348 (Fed. Cir. 2012) ............. 23

*Schoenhaus v. Genesco, Inc.*, 351 F.Supp.2d 320 (E.D. Penn. 2005) ............................ 24, 25

*Southwall Technologies v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) ........................ 16

*Uretek Holdings, Inc., v. YD West Coast Homes, Inc.*, 2016 WL 3021880, Case No:
8:15-cv-472-T-36JSS, (M.D. Fla. May 26, 2016).................................................. 37

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).................................... 4

**Statutes**

35 U.S.C. §103........................................................................................................ 14, 15

35 U.S.C. §112.......................................................................................... 38, 39, 40, 41, 42

35 U.S.C. §112(b) ........................................................................................................ 37

**INTRODUCTION**

Plaintiff The Ipe Clip Fastener Company, LLC ("Ipe Clip") respectfully submits this Amended Claim Construction Brief in support of its proposed claim constructions of the disputed terms and phrases of Defendant Simpson Strong-Tie Company, Inc.'s ("Simpson") patents: U.S. Patent No. 7,874,113 ("'113 Patent")(Appendix Exhibit A) and U.S. Patent No. 8,161,702 Patent ("'702 Patent")(Appendix Exhibit B).

**BACKGROUND**

Ipe Clip has been selling deck fasteners including the accused Extreme4 and ExtremeKD deck fasteners for over fifteen years. In 2002, Ipe Clip's predecessor and Blue Heron Enterprises, LLC, Simpson's predecessor in interest, entered into a License Agreement to license United States Patent No. 6,402,415. The parties amended the License Agreement in 2003 to grant a license to Ipe Clip to all other Blue Heron (now Simpson) patents. Ipe Clip has been paying royalties to Blue Heron (and then Simpson) since 2002 pursuant to the License Agreement for a round Ipe Clip deck fastener product.

Notably, Blue Heron and Ipe Clip were competitors in the deck fastener market. With the full knowledge of its competitor, Blue Heron/Simpson, Ipe Clip introduced the now-accused Extreme4 and ExtremeKD deck fasteners to the market in 2006 and 2009, respectively. The principal of Blue Heron, Harry Eberle, was intimately familiar with Ipe Clip's deck fasteners. The '113 Patent issued on January 25, 2011 and the '702 Patent issued on April 24, 2012.  Although Blue Heron accepted payments under the License Agreement for the round deck fastener product, and despite Blue Heron's knowledge of the now-accused Ipe Clip deck fasteners as Ipe Clip's competitor, Blue Heron never once

1

claimed that the Extreme4 and ExtremeKD deck fasteners were subject to royalties under the License Agreement. Ipe Clip has invested heavily in manufacturing and marketing these fasteners since it introduced them. It was not until last year, after Simpson acquired Blue Heron, that Ipe Clip's Extreme4 and ExtremeKD deck fasteners were claimed to be subject to royalties under the License Agreement.

Fearing a lawsuit, Ipe Clip brought an action against Simpson seeking a declaratory judgment that Ipe Clip did not breach the License Agreement. Simpson brought two counterclaims: one for breach of the License Agreement and one for patent infringement of the '113 Patent and '702 Patent. The parties have stipulated to dismiss the patent infringement counterclaim and there is no patent infringement cause of action pending.

In a reexamination of the '113 Patent, the United States Patent and Trademark Office ("USPTO") cancelled issued Claims 1-9, 14, 21, 22, 24, 26-29 and 33-41. The USPTO confirmed the patentability of Claims 10-13, 15-20, 23, 25 and 30-32 and determined that new Claim 42 is patentable.

In a reexamination of the '702 Patent, the USPTO cancelled Claims 1-4, 7-14, 17-23 and 25. The USPTO confirmed the patentability of Claims 5, 6, 15, 16 and 24 and determined that new Claims 26-29 are patentable.

Simpson now asserts that the Extreme4 clip is covered by Claims 10, 12, 13, and 15 of the '113 Patent and Claims 5, 15, 26 and 28 of the '702 Patent and that the ExtremeKD clip is covered by Claims 10, 12, 13, and 15 of the '113 Patent and Claims 5,

15, 26 and 28 of the '702 Patent. Simpson's Amended Disclosure of Infringement Contentions, p. 2.

## FACTUAL BACKGROUND

The Patents in Suit claim anchoring biscuit devices, and systems and methods using anchoring biscuit devices for joining three boards, i.e., two adjacent deck boards and a support board. "The present invention is directed to an improved biscuit for joining adjacent boards. More specifically, the invention is an anchoring biscuit device that has the ability for pre-setting distances between adjacent boards and attaching to at least one board by means in addition to the biscuit itself. The anchoring biscuit device physically joins two adjacent boards in the same plane to a third, supporting board." '113 Patent, Col. 1, ll. 17-23, '702 Patent, Col. 1, ll. 21-27.

Ipe Clip and Simpson have identified the following claim terms for construction:

1.   "projecting from the top element"

2.   "compressive element" and "compression members"

3.   "vertical support members" and "support member"

4.   "pre-cut biscuit slot"

5.   "center line"

6.   "along said center line of said top element"

7.   "away from said center line"

8.   "adjacent the center line"

9.   "defining engagement surfaces remote from the center line"

10.   "the engagement surfaces being constructed and arranged to confront vertically-extensive surfaces of slotted boards" and "engagement surfaces confronting the vertically-extensive surfaces at the slotted boards"

3

11.     "a predetermined length to maintain said top element in a predetermined position"

12.     "at least partially collapse under a predetermined compressive force" and "at least partially collapsible" and

13.     "top view footprint shape" and "from a top view footprint."

In this brief, Ipe Clip presents its constructions and evidence supporting the constructions.

## LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction is the judicial statement of what is and is not covered by the technical terms and other words of the claims. *Netword, LLC v. Central Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). Claim construction is a question of law for the Court. *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998); *see also Nystrom v. Trex Co.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005). "[T]he words of a claim 'are generally given their ordinary and customary meaning,' . . . [which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . [viewed] in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (internal citation omitted). In order to determine ordinary meaning, the court first evaluates the words of the claims themselves as set forth in the specification. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The court then reviews the specification to determine the proper construction as the specification "[u]sually, is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quotation omitted).

The specification can be dispositive because it can act like a dictionary in either explicitly or implicitly defining terms. *Vitronics*, 90 F.3d at 1582. "[T]he claims cannot be of broader scope than the invention that is set forth in the specification." *On Demand Machine Corp. v. Ingram Indus.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006). The specification is also important because it may "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . [which] is regarded as dispositive." *Phillips*, 415 F.3d at 1316 (citation omitted); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347-49 (Fed. Cir. 2004). *See also AAMP of Florida, Inc. v. Automotive Data Solutions, Inc.*, 2015 WL 6672257, Case No: 8:13-cv-2019-T-35TGW (M.D. Fla. Sept. 15, 2012).

Along with reviewing the claims themselves and the specification, a court should also consider the prosecution history of the patents-at-issue, including any related patents. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc); *Vitronics*, 90 F.3d at 1582. The prosecution history, like the specification, "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citation omitted).

"'[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution,' ... for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Computer Docking Station, Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-76 (Fed. Cir. 2008)

(internal citation omitted).  Prosecution disclaimer "can lie in a single distinction among many [to distinguish prior art]."  *Id*. at 1377.

If claim language is ambiguous after a review of the intrinsic record (e.g., specification, prosecution history, and other intrinsic evidence), a court "may look to extrinsic evidence to help resolve the lack of clarity."  *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).  This can include, for example, dictionaries as well as inventor and expert testimony.  *Markman*, 52 F.3d at 980. "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation.  *See Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 134 (1942) (relying on dictionaries to construe the claim term "embedded")." *Phillips*, 415 F.3d at 1322 (citations omitted). The ordinary meaning of some claim terms "may be readily apparent . . . involv[ing] little more than the application of widely accepted meaning of commonly understood words."  *Phillips*, 415 F.3d at 1314; *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).  "In such circumstances, general purpose dictionaries may be helpful."  *Phillips*, 415 F.3d at 1314.

Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning.  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).  A patentee may give an ordinary word a specialized meaning by clearly stating the definition and using it consistently.

> [A] patentee may choose to be his own lexicographer and
> use terms in a manner other than their ordinary meaning, **as**

> **long as the special definition of the term is clearly stated in the patent specification or file history**.
>
> *PC Connector Solutions LLC v. SmartDisk Corp.* 406 F.3d 1359, 1363 (Fed. Cir. 2005). (emphasis added.)

*See also Merck & Co., Inc. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1370 (Fed. Cir. 2005).

## LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") of deck fasteners would possess at least two years of experience in woodworking and/or construction. The skilled artisan would also have knowledge of varying methods of joining together boards, joists, panels and the like. Further, the POSITA would have basic knowledge of injection molding.

## PROPOSED CLAIM CONSTRUCTIONS

## I.   CLAIM TERMS TO BE CONSTRUED

### A.  *"compressive element" and "compression members"*

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend), Claims 10, 12, 13 and 15 (compressive element) | Cancelled Claims 1 and 11 (from which other asserted claims depend), Claims 5, 15, 26 and 28 (compression members) | A portion of the device that will at least partially collapse, not merely compress, under force (from opposing expansion or swelling of wood). A compressive element is characterized as including a contact point or surface, arranged on a side of a vertical plane through the center line. The contact point or surface is spaced from the vertical plane by a gap that positions the | Structure on an anchoring device that spaces deck boards farther apart than a vertical support member would space the deck boards in the absence of such structure, such structure being designed to engage the sides of deck boards and compact in response to deck board expansion. |

|  |  | contact point or surface further from the vertical plane than the support member. Under the force, at least a portion of the compressive element collapses or moves into the gap. |  |
|---|---|---|---|

The parties agree that the terms "compressive element" and "compression member" should be identically construed.[1]

### 1.    The Specification Supports Ipe Clip's Construction.

Ipe Clip's construction requires a geometric structure that allows for the compressive elements to do more than merely compress—they must collapse to some extent. The specification supports Ipe Clip's construction. "However, all of the present invention devices do include at least one compressive element, namely, a portion of the device *that will collapse or move under compression* (from opposing expansion or swelling of wood)." '113 Patent, Col. 1, ll. 37-41, '702 Patent, Col. 1, ll. 40-44. (emphasis added.) *See also*:

> These beams 21 and 23 might expand due to damp weather, rain, capture of moisture, high humidity, seasonal changes, shifts, etc. When this occurs, **compressive elements will be pushed toward one another and collapse**, e.g. in excess of 10 foot pounds psi, or some other preset parameter. **The collapse of compressive elements permits the beams to close in on one another to the sides of the vertical support members**. This is clearly illustrated for the FIG. 4A embodiment, in FIG. 4B. Here, compressive elements have been **forced to collapse inwardly** by

---

[1] To avoid redundancy in this brief, Ipe Clip will refer to compressive elements rather than compression members.

expanding beams 21 and 23, as exemplified by collapsed compressive elements 8 and 16. All parts are identically numbered as shown in the foregoing Figures.

'113 Patent and '702 Patent, Col. 6, ll. 55-67. (emphasis added)



Accordingly, the specification describes that the compressive elements (elements 8 and 16 in FIGS. 4A and 4B) are spaced from each other a distance greater than a thickness of the support member (element 17) such that as the beams move closer to each other, the compressive elements collapse—or move—into the gap or space between the compressive elements.  The collapse of the compressive elements permits the beams to close in on one another to the sides of the vertical support members, a functionality that requires more than mere compression.  This construction is also consistent with other examples in the specification.

For instance:

> FIG. 6 shows a bottom view with identical numbering. Note that compressive elements 32 and 34 are essentially hollow cylinders in this embodiment. … Device 51 is used in the same manner as device 1 described above with respect to FIGS. 4A and B, except that the compressive elements 32 and 34 **collapse** on the underside of the device, **inwardly** between portions of a single vertical support member.

9

'113 Patent and '702 Patent, Col. 7, ll. 8-18. (emphasis added.)



Thus, as in the embodiment of FIGS. 4A and 4B, the compression members are arranged to provide points of contact spaced from sides support members and are characterized by a gap therebetween. Specifically, in FIGS. 5 and 6, the gap is provided by the hollow cylinder. Thus, under compression, edges of the hollow cylinder will collapse into the hollow center of the hollow cylinder. Note, too, that the gap between laterally-opposing surfaces of the hollow cylinders 32, 34, is wider than the vertical support members 55, 59.



FIGS. 9A and 9B (reproduced immediately above) show another illustrative embodiment. Specifically, "FIG. 9A shows a top view of device 71 with installed beams 101 and 103, and these are not swollen. In FIG. 9B, the same beam[s] 101 and 103 have swollen, and the compressive elements 91, 93, 95, and 97 **have collapsed**, as shown." '113 Patent and '702 Patent, Col. 7, ll. 39-42. (emphasis added). Here, the compressive elements 91, 93, 95, and 97 are crescent shaped, and symmetrical across the center line. Thus, opposite ends of the crescent shape are further from the center line than the support

members 79, 81 (shown in dashed-lines in the FIGS. 9A and 9B) and are spaced along a

line perpendicular to the centerline.   Under compression, as shown in FIG. 9B, the

opposite ends collapse into the gap therebetween, until the compressive elements have a

lateral thickness that is the same as the support members 79, 81.

Further intrinsic support for the proffered definition of compressive elements is

shown in Figure 10:

> On the top side of device 120 are eight compressive
> elements 131, 133, 135, 137, 139, 141, 143, 145, and 147.
> These are thin cylindrical protrusions **that will collapse
> under compression**, e.g. from expanding boards. As
> shown in FIG. 10, they are further apart than the thickness
> of the vertical support members to create space between
> beams for expansion.
>
> '113 Patent and '702 Patent, Col. 7, ll. 50-56 (emphasis
> added).



Thus, in FIG. 10, the compressive elements are arranged in pairs symmetrical

relative to the centerline.   Specifically, compressive elements 137 and 141 form a first

pair, compressive elements 135 and 143 form a second pair, compressive elements 133

and 145 form a third pair, and compressive elements 131 and 149 form a fourth pair.

Individual elements comprising the pairs are spaced by a gap to be farther from a plane

bisecting the support member than the support members 125, 127 such that when a force acts on the compressive elements, each collapses into the gap, toward its pair.

FIG. 12 is also illustrative. "Vertical support members 177 and 179 also include outwardly extending, angled tails 181, 183, 185, and 187 and these are the **collapsible** compressive elements." '113 Patent and '702 Patent, Col. 8, ll. 5-7 (emphasis added). FIG. 12 is reproduced here:



Again, distal ends of the tails are spaced from each other across the centerline, to provide a wider spacing than the support members 177, 179. A compressive force, such as from swelling of adjacent boards, causes the tails to collapse into the space between it and its pair.

Moreover, FIG. 14 shows "two collapsible fins [249, 251] on each side of the vertical support member [that] act as collapsible compressive elements in a manner similar to those shown above." Col. 8, ll. 25-29. FIG. 14 is reproduced here:



Accordingly, as in FIGS. 16, 17, 18, 19, and 20, "compression members" provide contact points or surfaces spaced outwardly from the support member and that include a gap or void between the surfaces/points and a vertical plane bisecting the device.   In each, a compressive force will cause these members to collapse or fall into the gap or void.

Ipe Clip acknowledges that FIG. 15 shows an embodiment in which "[o]n the right underside of top 267 are two fins 281 and 283, that have lengths (into the page, at right angle to vertical support member 265), **that is greater than the thickness of member 265.**" '113 Patent and '702 Patent, Col. 8, ll. 46-48. (emphasis added.)   While these compression members may not include the "gap" required by Ipe Clip's proffered construction, Ipe Clip submits that, as discussed below, the prosecution history acts to limit the claims to require a compressive element to include more than mere compression. While the description of FIG. 15 indicates that the two fins 281, 283 "are collapsible and act as compressive elements with respect to adjourning (sic) boards," Col. 8, ll. 48-51, this one isolated instance is not sufficient for the inventor to have served as his own lexicographer and turned mere compression into collapsible.



Fig. 15

It is significant to note that the specification fails to show *any* embodiment where the compression elements are shown merely compressed; rather, ***all embodiments*** show the compression elements collapsing, i.e., moving or falling into a space. The specification does not show compaction or even mention the word compaction.

### 2.    Simpson is Barred by Prosecution Disclaimer from Recapturing Compression Without Collapsing.

Simpson is barred by prosecution disclaimer from claiming coverage for compressive elements that do not collapse. During the prosecution of the '702 Patent, Simpson amended the claims to include "at least partially collapsible" to modify compression members. See Appendix Exhibit D, pp. IC-App-0390-396. This amendment was made in response to a rejection on March 8, 2011 for obviousness under 35 U.S.C. §103. *See* Appendix Exhibit D, pp. IC-App-0397-401; IC-App-0358-371.

To argue against the obviousness rejection, Eberle argued: "For example, amended claim 1 recites, among other features, 'one or more at least partially collapsible compression members projecting from the top element,' which is absent from the cited art." Appendix Exhibit D, p. IC-App-0398. Eberle thereby admitted that the claim requires a compression member *that is at least partially collapsible*: "However, the first spline section 54 of Chen is neither a "compression member," nor is "at least partially compressible," unlike the one or more compression members recited in claim 1." Appendix Exhibit D, p. IC-App-0398. Eberle admitted that the claims were amended in response to the obviousness rejection by the Examiner. Appendix Exhibit D, pp. IC-App-0397-401; IC-App-0358-371.

After Eberle amended the claims, the USPTO again rejected all claims under 35 U.S.C. §103. The Examiner made an exception for the compression member, stating as follows:

> The only arguments that were present within the submission by the applicant [Eberle] on 9/8/11 were that the compression member of Chen [6,363,677] was not a compression member that was at least partially compressible. The examiner notes that given the materials listed in columns 7 and 8 of Chen, the compression member is compressible. However, the examiner believes this argument is in error **as the claims, as amended, add the limitation of the compression member being partially collapsible,** *of which Chen cannot be given its geometry*.
>
> Appendix Exhibit D, IC-App-0415. (emphasis added).

Thus, the USPTO recognized—and found critical—that it was the geometry of the compression members which allowed them to be partially collapsible.  The type of material, alone, did not make the compressible member "collapsible."  In fact, in Chen (Patent No. 6,363,677), the materials referred to by the Examiner are:

> The splines can be made of any thermoplastic material like vinyl containing thermoplastic such as polyvinylchloride, polyvinylacetate, polyvinylalcohol, and other vinyl and vinylidene resins and copolymers thereof. Other examples of suitable thermoplastic materials include, but are not limited to, polyethylene, such as low density polyethylenes and high density polyethylenes and copolymers thereof; styrenes such as ABS, SAN, and polystyrenes and copolymers thereof; polypropylene and copolymers thereof; saturated and unsaturated polyesters; acrylics and polyamides, such as nylon; engineering plastics such as acetyl, polycarbonate, polyimide, polysulfone; polyphenylene oxide; sulfide resins; and the like.
>
> Chen, Col. 7, l. 57- Col. 8, l. 2. Appendix Exhibit E, IC-App-0495.

15

Even if Eberle believed that Chen did not disclose compression elements, Eberle did not choose to rely on that argument but instead amended all claims to add the "collapsible" limitation. Even though Eberle stated that he did not acquiesce in the Examiner's position, that simple boilerplate statement is not sufficient to avoid prosecution disclaimer.

All of these materials are compressible, however, it was understood by the USPTO, and the claims now require, that the geometry of the compression member makes it at least partially collapse. Specifically, it is the spaced arrangement of surfaces, spaced by a gap wider than the support member, that allows the compressive elements to be at least partially collapsible.

Simpson cannot reclaim compressive elements that do not partially collapse since the patentee gave that up to obtain the patent. "A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record." *Southwall Technologies v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995). Simpson has disclaimed any interpretation of the term compressive element that does not include collapsible. "[T]he alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1326 and fn. 1 (Fed. Cir. 2003). Here, a proper construction of "compressive element" requires the geometry that allows for collapse.

The Federal Circuit held "just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the

USPTO may bar an inconsistent position on claim construction." *Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1221 (Fed. Cir. 1996).

As discussed above, **Simpson amended all instances of compression members to include "at least partially collapsible" in order to overcome the obviousness rejection by the Examiner**. By that amendment, under the doctrine of prosecution disclaimer, Simpson disclaimed compression members that do not partially collapse and Simpson is estopped from now attempting to recapture the previously disclaimed meanings of compression members that do not partially collapse. *Omega Eng'g, Inc.*, 334 F.3d at 1323.

### 3.  Extrinsic Evidence Supports Ipe Clip's Construction.

Extrinsic evidence also supports Ipe Clip's proposed construction. Compress means: "1: to press or squeeze together; 2: to reduce in size, quantity, or volume as if by squeezing". https://www.merriam-webster.com/dictionary/compress (last accessed 9/18/17). Appendix Exhibit M.

Collapse means: "to fall or shrink together abruptly and completely: fall into a jumbled or flattened mass through the force of external pressure". https://www.merriam-webster.com/dictionary/collapse (last accessed 9/18/17). Appendix Exhibit N.

Each of the embodiments shows the compressive elements collapsing, i.e., falling into a space. *None of the embodiments show mere compression*, and mere compression was disclaimed, as discussed above.

Simpson's proposed construction is improper because Simpson's construction introduces a new term, compact, not found in the specification or claims, that would also

have to be construed and because it reads out the partially collapsible limitation. Simpson's construction requires only compression, not collapsing.

Simpson's proposed construction is also improper because it reads out the spacing language. The outermost portions of the compressive elements are further away from the centerline[2] than the outer portions of the vertical support members.

> Top element 3 includes four upwardly projecting compressive elements 6, 8, 16 and 18. These are located opposite one another, as shown, are located away from imaginary center line 20. Also, they are located away from the vertical support members 15 and 17 (from top view) and **are further away from the vertical support members at their outermost portions, from the centerline, than the outermost portions of the vertical support elements. This concept applies to the other present invention devices described below**, as well.

> '113 Patent, Col. 6, ll. 10-18 and '702 Patent, Col. 6, ll. 11-19. (emphasis added.)

> *See also*:

> Compressive elements 8 (and 6, not shown in FIG. 4) place beam 23. In other words, **the compressive elements** 6, 8, 16, 18 space the beams 21 and 23 **further apart than the vertical support members 15 and 17 would in their absence**.

> '113 Patent and '702 Patent, Col. 6, ll. 52-55. (emphasis added)

 

---

[2] The construction of center line is discussed below.

Consequently, Ipe Clip's proposed construction should be adopted.

**B.**     ***"vertical support members" and "support member"***

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend), Claims12, 13 and 15 (vertical support member) | Cancelled Claims 1 and 11 (from which other asserted claims depend), Claims 5, 15, 26 and 28 (support member) | Elements that have a predetermined height so as to rest on a joist to support the deck fastener during attachment of two adjacent boards. | Vertically extending structures of a deck anchoring device that allows such vertically extending structures, or a compressive element, to rest on the side of a board into which the deck anchoring device may be inserted. |

The parties dispute the scope of the term "vertical support members" and "support member". The parties agree that the terms "vertical support members" and "support member" should be identically construed except that the term "vertical support members" requires a plurality of support members.

Simpson's proposed construction is not consistent with the meaning of "vertical support" or "support". Using Simpson's proposed construction, not only is "vertical support" read out of the claim because using Simpson's construction the vertical support member does not need to rest on the joist and the members merely separate the adjacent boards *horizontally*, but Simpson also has improperly broadened the claim language to include a compressive element as the vertical support member. The '113 Patent uses the term "vertical support member." The '702 Patent uses the term "support member extending downwardly" which means the same thing as vertical support member. For

purposes of clarity and conciseness, Ipe Clip will refer to "vertical support member" rather than "support member extending downwardly."

It is well-settled in patent law that words of the claims have meaning. "[C]laims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). "All limitations in a claim must be considered meaningful. *See Perkin-Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532-33, 3 USPQ2d 1321, 1324-25 (Fed. Cir. 1987)." *Lantech, Inc. v. Keip. Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994). *See also Randall May Int'l, Inc. v. DEG Music Products*, 378 Fed. Appx. 989, 998 (Fed. Cir. 2010)("… all the limitations in a claim must be considered meaningful") *citing Cablestrand Corp. v. Wallshein*, 29 F.3d 644 (Fed. Cir. 1994).

The specification supports Ipe Clip's construction. "Vertical support members 15 and 17 have a predetermined height so as to **rest on a joist** [not board] in such a way as to establish biscuit top element 3 at a predetermined height from the joist for attachment of two adjacent boards thereto which have pre-cut biscuit slots." '113 Patent, Col. 6, ll. 23-27, '702 Patent, Col. 6, ll. 24-28. (emphasis added). The support member supports the deck fastener on the joist so that it can be attached. It must rest on the joist.

The "support" in "vertical support member" must mean vertical support. Otherwise, the patentee would have just claimed "member". "[C]laims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon,* 441 F.3d at 950. The "support" in support member is to support the fastener vertically on the joist.

Simpson has argued that the following language supports its proposed construction:

> Vertical support member 245 has a predetermined height so as to rest on the side of a beam into which device 240 may be inserted and, optionally, so as to rest on a joist in such a way as to establish biscuit top element 247 at a predetermined height from the joist for attachment of two adjacent boards thereto which have pre-cut biscuit slots corresponding thereto.

'113 Patent and '702 Patent, Col. 8, ll. 29-34.

However, Simpson disregards that this language only appears with respect to Figure 14 which is a different embodiment and includes fins. This embodiment is claimed in independent (now cancelled) Claims 22 and 33 of the '113 Patent. The "fin" claims are not asserted by Simpson against Ipe Clip. This part of the specification does not relate to the claims at issue in this litigation and indeed the USPTO cancelled these claims.

Even if this language were to support a broader construction than proffered by Ipe Clip, such broader construction would only mean that the vertical support member *could* (not must) touch the side of a beam. Nowhere is Simpson's proposed construction of "allows … a **compressive element**[] to rest on the side of the board…" supported. (emphasis added). Simpson cannot support its proposed construction of vertical support member to allow the compressive element rather than the vertical support member to rest on the side of the board.

Extrinsic evidence also provides support for Ipe Clip's proposed construction: "to hold up or serve as a foundation or prop for." https://www.merriam-webster.com/dictionary/support (last accessed 9/18/17). Appendix Exhibit O. Under

Simpson's proposed construction, the support member is only there to "rest" on the side of the board, or more egregiously, to allow some other feature (like a compressive element) to "rest" on the side of the board. This is nonsensical and reads out the term "vertical support".

Consequently, Ipe Clip's proposed construction should be adopted.

### C.    *"pre-cut biscuit slot"*

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend)  (pre-cut biscuit slot) | Slotted boards | A biscuit-shaped slot such as cut by a biscuit joiner. | Simpson does not believe that this term needs to be construed; alternatively, "a groove in a deck board into which a side of the horizontal top element of a deck anchoring device may be inserted." |

The parties dispute the scope of the term "biscuit slot" (and "pre-cut biscuit slot").

Simpson's construction is overbroad. Even assuming *arguendo* that the patents describe long grooves in the adjacent boards that might support a broad construction, the patents do not claim grooves, but rather biscuit slots or slotted (not long grooved) boards. As discussed more fully below, biscuit slot is a term known by a skilled artisan. Simpson's construction improperly broadens the ordinary meaning of biscuit slot to grooves running along an entire length of a board, not merely biscuit slots. Claims cannot "enlarge what is patented beyond what the inventor has described as the invention." *Netword, supra,* 242 F.3d at 1352. Even though grooves may be described in the

specification, the '113 Patent claims "biscuit slots" and the '702 Patent claims "slotted boards" (not grooved boards). Therefore, to the extent the specification describes grooves that run the length of the board—which is disputed—the grooved boards have been dedicated to the public. This disclosure-dedication doctrine has been well-established in patent law for over one hundred years. The Supreme Court held: "the claim of a specific device or combination, and an omission to claim other devices or combinations apparent on the face of the patent, are, in law, a dedication to the public of that which is not claimed." *Miller v. Bridgeport Brass Co.*, 104 U.S. 350, 352 (1881).

The Federal Circuit rearticulated the disclosure-dedication factors in *SanDisk Corp. v. Kingston Technology Co., Inc.*, 695 F.3d 1348 (Fed. Cir. 2012):

> As we held in *Johnson & Johnston*, "[W]hen a patent drafter discloses but declines to claim subject matter, ... this action dedicates that unclaimed subject matter to the public." 285 F.3d at 1054. *Johnson & Johnston's* disclosure-dedication rule is not without restriction. In *PSC Computer Products v. Foxconn International, Inc.*, 355 F.3d 1353 (Fed. Cir. 2004), we explained that the rule "does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public." *Id.* at 1360. Rather, "the disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed." *Id.* Additionally, in *Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, 429 F.3d 1364 (Fed.Cir.2005), this court further clarified that "before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed subject matter must have been identified by the patentee as an alternative to a claim limitation." *Id.* at 1379.
> *SanDisk Corp.*, 695 F.3d at 1363-1364, *quoting Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co., Inc.,* 285 F.3d 1046 (Fed. Cir. 2002).

Even if board-long grooves were disclosed in the patent specifications (which they were not), Simpson did not claim them.  Rather the patents only claim biscuit slots and slotted boards. As discussed below, a POSITA at the time of the invention understood that grooves and biscuit slots/slotted boards were different. Since Simpson did not claim boards with grooves running the entire length of the boards, any disclosure of same would have become public property. *See Central Institute for Experimental Animals v. Jackson Laboratory*, 726 F.Supp.2d 1045, 1047 (N.D. Cal. 2010) ("This rule, which is referred to as the disclosure-dedication rule, is based on the fundamental principle that the claims define and give notice of the scope of patent protection. What is claimed is protected, and 'what is not claimed is public property.' [*Johnson & Johnston*] at 1053 (quoting *Mahn v. Harwood*, 112 U.S. 354, 361, 5 S.Ct. 174, 28 L.Ed. 665 (1884)). Because the claims, not the specification, are the sole measure of the patentee's right to exclude, the disclosure of unclaimed subject matter in the specification 'has made it public property if it was not so before.' *Id*.").

The Court's decision in *Schoenhaus v. Genesco, Inc.*, 351 F.Supp.2d 320, 325-326 (E.D. Penn. 2005) is instructive. In *Schoenhaus*, the Court held that even though the specification had examples of other parts of the shoe that could rotate, the plain language of the claim only included a heel cup. "While the specification does contain a statement allowing other parts of the shoe to provide for rotation, *Id.* at 443-45, the plain language of the patent claim is dispositive. *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1106 (Fed. Cir. 1996) ('Subject matter disclosed but not claimed in a patent application is dedicated

to the public.').'' *Schoenhaus*, 351 F.Supp.2d at 325-326. Similarly here, any subject matter that was disclosed but not claimed is dedicated to the public.

Moreover, the intrinsic evidence supports Ipe Clip's construction: "Side walls may be irregular or regular, and may have any top view, workable footprint similar to that shown in the segments that will fit into beam grooves or continuous straight grooves, e.g. biscuit cuts, half circle or arc cuts, square or rectangular cuts." '113 Patent and '702 Patent, Col. 8, ll. 35-39.  The patentee stated that the side walls on the top of the device and that the side walls could be shaped to fit into grooves, biscuit slots and other kinds of cuts. However, the '113 Patent only claimed biscuit slots.

Eberle also recognized that biscuit slot had a specific meaning in the art that was for oval shaped slots and did not include a board-long groove: "It is described as a biscuit joiner for cutting semi-elliptical slots…" '113 Patent, Col. 2, ll. 63-64 and '702 Patent, Col. 2, ll. 66-67 and "[t]he biscuit fits within arcuate slots formed in the workpieces…" '113 Patent, Col. 3, ll. 51-52, '702 Patent, Col. 3, ll. 53-54.

Further support for Ipe Clip's construction is found in the extrinsic evidence and statements made by Simpson and the inventor Harry Eberle. ***On Simpson's own website, Simpson itself differentiates between boards with slots and boards with grooves***. See http://www.ebty.com/installation_hidden_deck_fasteners.php (last accessed 9/18/17). Appendix, Exhibit U, IC-App-00641, a portion of which is excerpted below.

- Cut a slot (or kerf) in deck board at each joist and deck board intersection using a 1/8" router bit or plate joiner (biscuit cutter #20).



**Note:** Adjust router or plate joiner (biscuit cutter) height so that the bottom edge of the EB-TY fastener is flush with the bottom of the deck board.

**Note:** If using pre-grooved decking no slot or (kerf) cut is necessary.

Furthermore, Simpson owns United States Patent No. 6,402,415 ("'415 Patent").

Appendix, Exhibit V. Harry Eberle is the inventor of the '415 Patent as well as the '113

Patent and '702 Patent. During a reexamination proceeding before the USPTO of the '415

Patent, the patentee differentiated a prior art reference, Smith, from the '415 invention:

> The Smith and Elmendorf patents, however, are also inappropriate as a basis for rejection, for a number of reasons. First, the Smith patent describes a flooring device for attaching flooring having a continuous groove cut into the side, and not a biscuit cut. … **All of these differences teach away from rather than toward the present invention**.
>
> Appendix, Exhibit W, IC-App-0740. (emphasis added).

The Examiner stated:

> Smith contemplates floor boards having a groove extending substantially the entire length of the board, so that there would be no motivation to use a fastening device having a biscuit-shaped top view, as would be suited for engaging a biscuit-receiving slot, instead of an extended groove.
> Appendix, Exhibit W, IC-App-0777.

Moreover, the patentee (Eberle) submitted a **<u>sworn</u>** affidavit in which he

described the boards into which Eb-Ty fastener was installed as follows:

26

> The EB·TY® PRODUCT is typically installed in a deck system with its opposite side walls inserted into respective biscuit-receiving slots cut in the sides of the adjacent boards.
>
> Appendix, Exhibit W, IC-App-0876.

The Requester also understood slotted to mean something different from grooved:

> It is therefore prima facie obvious under 35 USC 103 to adopt or modify the Elmendorf flange shape onto the Smith flange so as to accommodate discretely slotted, as opposed to longitudinally grooved, flooring members.
>
> Appendix, Exhibit W, IC-App-0668.

Accordingly, all three parties involved in the '415 reexamination (the patentee, the requester and the USPTO) differentiated between slots and grooves.

The '415 Patent claims "two adjacent boards which have been pre-cut with biscuit receiving slots". Appendix, Exhibit V, IC-App-0651-652. Although this language does not rise to the level of prosecution disclaimer because the '415 Patent is not in the same family of patents as the '113 Patent and '702 Patent, it is relevant to what the inventor considered his invention to be. "As the court of appeals has explained, when it comes to a patentee's description of its own invention, '[w]e take the patentee at its word.' *Apple, Inc. v Motorola, Inc.*, 2011 US Dist. LEXIS 156969, at *50 (W.D. Wis Oct. 13, 2011) No. 10-cv-662-bbc, *quoting Microsoft*, 357 F.3d at 1350. *See also Jobdiva, Inc. v Monster Worldwide, Inc.*, 2014 US Dist LEXIS 141096, at *20 (S.D.N.Y. Oct. 3, 2014), No. 13-cv-8229 (KBF)("Statements made by a patentee during prosecution prevent claim terms from becoming ever-changing as the need and situation changes.").

The meaning of biscuit slot is well known to a POSITA. It is a basic woodworking term. It is even taught at the high school level. Project Lead the Way Wood

27

Fasteners, Joinery, and Adhesives, Appendix Exhibit F, pp. IC-App-0498-0506. An excerpt Project Lead the Way Wood Fasteners, Joinery, and Adhesives is below.



IC-App-0499. Another excerpt from the same reference shows that the slots do not run the length of the board. Appendix Exhibit F, IC-App-0501.



See also http://www.woodmagazine.com/woodworking-tips/techniques/joinery/biscuits-marking-guide (last accessed 9/18/17) which shows that the biscuit slots are not grooves which run the length of the board. *See* Appendix Exhibit G, IC-App-0507-0508.

One of the deck fasteners showing a device covered by the patents can be seen at http://edeck.com/accessories/ebty-hidden-deck-fasteners/ (last accessed 9/18/17), Appendix Exhibit H, IC-App-0509. A picture is below:



IC-App-0509. Again, this shows a biscuit slot, not a groove down the entire length of the board.

See also http://www.diynetwork.com/how-to/skills-and-know-how/carpentry-and-woodworking/how-to-use-a-biscuit-joiner (last accessed 9/18/17) posted on Feb. 1, 2001 (Appendix Exhibit I, IC-App-511-0517) and see also https://www.canadianwoodworking.com/tipstechniques/use-your-router-biscuit-joiner posted from the October/November 2002 issue. (Appendix Exhibit J, IC-App-0518-522). See also https://www.nrha.org/How-To/shelving/woodjoint/woodjoints.htm (last accessed 9/18/17) posted on Feb. 1, 2001 which discusses the different types of joints and differentiates between grooves and biscuit slots. (Appendix Exhibit K, IC-App-0523-529). See also https://quizlet.com/3894414/woodworking-terms-flash-cards/ (last accessed 9/18/17) posted on Feb. 1, 2001 which also differentiates between a biscuit slot and a groove as follows:

| Biscuit Joint | An oval shaped disk that when inserted in a slot with glue swells to form a tight bond. A special tool is required to cut the slot. |  |
| --- | --- | --- |

| Tongue and Groove | A joinery method where a board has a protruding tongue on one edge and a groove on the other, the tongue of one board fits into the groove of the next. |  |

*See* Appendix Exhibit L, IC-App-0532, IC-App-0544.

There is nothing in the specification and no extrinsic evidence supports Simpson's construction. Simpson's original claim construction brief relied heavily on an argument that because there were claims covering differently-shaped top elements, biscuit slot or slotted board encompassed a construction that included a long-grooved board. However, the USPTO founded unpatentable and cancelled **all** of the claims covering differently-shaped top elements. Biscuit slot is a known term to a person of ordinary skill in the art. It is not a groove down the length of a board. Rather it is a slot—made by a biscuit joiner that is made so that the biscuit can be inserted.

Thus, Ipe Clip's proposed construction should be adopted.

### D. *"center line"*

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend) | Cancelled Claims 1 and 11 (from which other asserted claims depend), Claims 26 and 28 | The imaginary line that is equidistant from opposite side portions of the top element. | Simpson does not believe that this term needs to be construed; alternatively, "imaginary band that runs horizontally through the central portion of a deck anchoring device". |

The parties dispute the scope of the term "center line". The center line is just that—a line. Simpson's construction is wrong because it improperly broadens the claim to include a band rather than a line.

There is nothing in the intrinsic evidence supporting Simpson's broad construction of a band rather than a line. Cancelled Claim 1 of the '702 Patent defines center line: "a horizontally-extending top element having a center line and side portions extending from the center line in opposite lateral directions transverse to the center line." Thus, the center line—not band—can only be in one position—equidistant from both side portions. The side portions are the part of the fastener that fit into the biscuit slots.

The abstract refers twice to an imaginary center line. *See also* the Summary of the Invention which refers to "imaginary centerline". '113 Patent and '702 Patent, Abstract.

The drawings refer to "imaginary center line 20". '113 Patent, Col. 6, ll. 12-13, '702 Patent, Col. 6, ll. 13-14.



FIG. 1

Furthermore, extrinsic evidence also supports Ipe Clip's construction: "a real or imaginary line that is equidistant from the surface or sides of something". https://www.merriam-webster.com/dictionary/centerline (last accessed 9/18/17). Appendix Exhibit P. *See Phillips*, 415 F.3d at 1322 (citations omitted).

31

The term "center line" also appears in the following disputed terms: "along the center line," "away from the center line," "adjacent the center line," and "remote from the center line."   For purposes of economy, Ipe Clip will not reiterate the center line arguments set forth above and will concentrate only on the remaining parts of these claim terms.

### 1.     "along" said center line of said top element

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend) | N/A | "in a line matching the length or direction of" the center line. | "Extending horizontally in the same direction and plane as" the imaginary center band. |

The term "along" is not used anywhere in the specifications of the patents in this context. Simpson's construction does not clarify the meaning of along.

The extrinsic evidence supports Ipe Clip's proposed construction: "in     a     line matching the length or direction of." https://www.merriam-webster.com/dictionary/along (last accessed 9/18/17). Appendix Exhibit Q. This is consistent with the plain and ordinary meaning of along. *See Phillips*, 415 F.3d at 1322 (citations omitted). Ipe Clip's proposed construction should be adopted.

## 2.      "away" from said center line

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend) | N/A | "Not touching" the center line. | Simpson does not believe that this term needs to be construed; alternatively, "beyond the imaginary center band". |

The parties dispute the scope of the term "away from said center line".  In essence, Ipe Clip's construction of "away from" requires that there be a space between the object and the center line with no portion contacting or touching the center line while Simpson's construction only adds more ambiguity, as "beyond" would also have to be construed.

Ipe Clip's proposed construction is consistent with the plain and ordinary meaning of away from and should be adopted.

## 3.      "adjacent" the center line

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| N/A | Cancelled Claims 1 and 11 (from which other asserted claims depend) and Claims 26 and 28 | "Next to but not on" the center line. | "Near or on" the imaginary center band. |

The term "adjacent" is not used anywhere in the specifications of the patents in this context.   The parties dispute the scope of the term "adjacent the center line". In essence, Ipe Clip and Simpson agree that "adjacent" means "near" but disagree regarding contact/touching the line. Ipe Clip's construction of "adjacent" requires that the object be next to with at most the border touching the center line.   In contrast, Simpson's construction of "adjacent" allows the object to be on the center line.

The plain and ordinary meaning of adjacent is:

> "a: not distant: nearby
> - the city and *adjacent* suburbs
>
> b: having a common endpoint or border
> - *adjacent* lots
> - *adjacent* sides of a triangle
>
> c: immediately preceding or following".

https://www.merriam-webster.com/dictionary/adjacent   (last accessed 9/18/17). Appendix Exhibit R. *See Phillips*, 415 F.3d at 1322 (citations omitted).

For example, if a park was adjacent to your yard, it would not be in your yard, at most the borders might touch. Adjacent means near or next to, not on or in. Accordingly, the Court should adopt Ipe Clip's proposed construction.

**E.**     *defining engagement surfaces "remote from" the center line*

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| N/A | Cancelled Claims 1 and 11 (from which other asserted claims depend) and Claims 26 and 28 | Surfaces arranged to face the surface of the slotted board in which the slot is formed "far removed from and not touching" the center line. | Establishing points at which two bodies meet that are not on the imaginary central band. |

The parties dispute the scope of the term "defining engagement surfaces remote from the center line". Engagement surfaces will be discussed below in the next section.

The word "remote" only appears in the claims of the patent. The plain and ordinary meaning of "remote from" is "far removed in space, time, or relation." https://www.merriam-webster.com/dictionary/remote (last accessed 9/18/17). Appendix Exhibit S.  *See Phillips*, 415 F.3d at 1322 (citations omitted). Thus, Ipe Clip's construction of "remote from" to mean far removed from and not touching is consistent with its plain and ordinary meaning. It is also consistent with the specification.   For instance, FIG. 4A shows that the external surfaces of the compressive elements 6, 8, 16, and 18 are far removed from and not touching the center line 20.  In all other examples, too, the claimed surfaces that are alleged to be "remote from" are always far removed from and not touching the center line.

Ipe Clip's proposed construction should be adopted. Simpson's construction is consistent with the term adjacent, not with the term remote.

**F.**   ***"the engagement surfaces being constructed and arranged to confront vertically-extensive surfaces of slotted boards" and "engagement surfaces confronting the vertically-extensive surfaces at the slotted boards"***

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| N/A | Cancelled Claims 1 and 11 (from which other asserted claims depend) and Claims 26 and 28 | Surfaces arranged to face the surface of the slotted board in which the slot is formed. | Establishing portions of a deck anchoring device designed to meet the sides of boards having grooves for deck anchoring device insertion. |

The parties dispute the scope of the term "the engagement surfaces being constructed and arranged to confront vertically-extensive surfaces of slotted boards". Simpson's proposed construction improperly introduces a motivation component to the claim. In other words, if the proposed surface was not "designed to" meet the surface of the slotted board in which the slot is formed, then it would not be covered by the claim.

In addition, for the reasons set forth in the section below discussing the term "biscuit slot", Simpson's proposed construction includes grooves that run the length of the board and is overbroad. Ipe Clip's proposed construction should be adopted.

## II.   INDEFINITE CLAIM TERMS

Simpson's proposed construction would prejudice Ipe Clip because it would provide no notice or ability for Ipe Clip (or any other person or company) to determine what would constitute alleged infringement.

36

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. §112(b). "A claim is invalid for indefiniteness if its language, viewed in light of the specification and prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Uretek Holdings, Inc., v. YD West Coast Homes, Inc.*, 2016 WL 3021880, *3, Case No: 8:15-cv-472-T-36JSS, (M.D. Fla. May 26, 2016), *quoting Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

However, Ipe Clip is mindful of this District's precedent that:

> The Court agrees with those courts that have declined to rule on indefiniteness at the *Markman* stage, and finds that it would be more appropriate and logical to defer the full consideration of any potential indefiniteness challenge to the summary judgment stage, after all fact and expert discovery has been completed. Therefore, for purposes of this order, the Court will consider Defendants' indefiniteness arguments "to determine only whether such claims are amenable to construction and, if so, what construction is appropriate for the claimed ambiguous terms in light of the present intrinsic and extrinsic evidence provided," … Any construction given by the Court shall be without prejudice to Defendants' ability to challenge the validity of the claims for indefiniteness at the summary judgment stage.
>
> *Uretek Holdings,* 2016 WL 3021880 at *3. (citations omitted).

Accordingly, Ipe Clip will alert the Court of the five claim terms Ipe Clip asserts are indefinite but understands that indefiniteness is not being decided during claim construction. Should the Court desire full briefing on this issue, Ipe Clip would be pleased to supplement this brief.

37

### A. "a predetermined length to maintain said top element in a predetermined position"

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend) | N/A | Indefinite | Simpson does not believe that this term needs to be construed; alternatively, "a vertical length sufficient to allow a deck anchoring device to remain in a desired position during the joinder of two boards and a support board". |

Cancelled Claim 1 (from which other asserted claims depend) of the '113 Patent, read in light of the specification delineating the patent and the file history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention especially with respect to the term "a predetermined length to maintain said top element in a predetermined position" is indefinite. Thus, cancelled Claim 1 of the '113 Patent and any claims dependent thereon (asserted claims 10, 12, 13 and 15) are invalid for indefiniteness under 35 U.S.C. §112.

A skilled artisan would not understand what is claimed by "predetermined length" or "predetermined position". There is no teaching in the patents or their file histories of how long a predetermined length is, or how the POSITA is to determine the "predetermined" length or the "predetermined" position. Since a skilled artisan cannot determine the boundaries of the claim, it is indefinite. *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (holding that a claim is indefinite when "a skilled artisan could not discern the boundaries of the claim based on the claim

language, the specification and the prosecution history, as well as her knowledge of the relevant art.").

Simpson's proposed construction does not cure the indefiniteness of the claims. Simpson merely substitutes "desired position" for "predetermined position" and "a vertical length sufficient to" for "predetermined length." There is nothing in Simpson's proposed construction that would allow a POSITA to understand the boundaries of the claim language.

Thus, cancelled Claim 1 of the '113 Patent and any claims dependent thereon including, but not limited to asserted claims 10, 12, 13 and 15 are invalid for indefiniteness under 35 U.S.C. §112.

**B.**       ***"at least partially collapse under a predetermined compressive force" and "at least partially collapsible"***

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend) | Cancelled Claims 1 and 11 (from which other asserted claims depend), Claims 26 and 28 | Indefinite | Simpson does not believe that the terms "at least partially collapse under a predetermined compressive force" and "at least partially collapsible" need to be construed; alternatively, "to become to some degree compacted in response to being subjected to a pre-calculated pushing force". |

The term "at least partially collapse under a predetermined compressive force" is indefinite. A skilled artisan would not understand what is claimed by "at least partially collapse" or "at least partially collapsible". There is no teaching in the patents or their file histories for how the POSITA is to determine the "predetermined compressive force" is

or what "at least partially collapse/[collapsible]" means. Since a skilled artisan cannot determine the boundaries of the claim, it is indefinite.  *See Halliburton, supra.* There is no particularity or definiteness to this language as required by 35 U.S.C. §112. *See In re Oetiker*, 23 U.S.P.Q.2d 1641 (1990) (finding a claim indefinite because there is "no standard or guidelines" to determine to the extent of 'relatively flat.'").

Simpson's proposed construction does not cure the indefiniteness of the claims. Simpson merely substitutes "pre-calculated pushing force for "predetermined compressive force". The patents provide no guidance whatsoever for how to "pre-calculate" a "pushing force." Simpson's definition does not allow a party to evaluate infringement.  It would not be possible to evaluate under any metric the meaning of "pre-calculated pushing force."  It would not be possible to evaluate the meaning of "pre-calculated pushing force" under any method.

Simpson's proposed construction of "at least partially collapsible" as "to become to some degree compacted" is not measurable or evaluable. Simpson's definition does not allow a party to evaluate infringement.  It would not be possible to evaluate under any metric the meaning of "to become to some degree compacted."  It would not be possible to evaluate the meaning of "to become to some degree compacted" under any method. Would 50% compaction be covered by the claim? What about 10%? Would 1%? Would .01%?

Furthermore, Simpson's proposed construction reads out collapsing. As discussed above, Eberle specifically stated that the compressive elements had to at least partially

collapse. Compaction is not enough. The doctrine of prosecution disclaimer prohibits Simpson from recapturing compressive elements that do not collapse.

Thus, cancelled Claim 1 of the '113 Patent and any claims dependent thereon, including, but not limited to asserted Claims 10, 12, 13 and 15 of the '113 Patent are invalid for indefiniteness under 35 U.S.C. §112.

Furthermore, cancelled Claims 1 and 11 of the '702 Patent, any claims dependent thereon, including, but not limited to asserted Claims 5 and 15, and Claims 26 and 28 are invalid for indefiniteness under 35 U.S.C. §112.

### C.     *"from a top view footprint" and "top view footprint shape"*

| '113 Patent | '702 Patent | Ipe Clip's Proposed Construction | Simpson's Proposed Construction |
|---|---|---|---|
| Cancelled Claim 1 (from which other asserted claims depend) (from a top view footprint); Cancelled Claim 1 (from which other asserted claims depend) (top view footprint shape) | N/A | Indefinite | Simpson does not believe that the terms "from a top view footprint" and "top view footprint shape" need to be construed; alternatively, "viewed from a top-down perspective" and "shape of deck anchoring device when viewed from a top-down perspective," respectively. |

Using Simpson's proposed construction, Simpson has read out the terms footprint and shape. It is well-settled in patent law that words of the claims have meaning. *See Bicon, supra. See also Randall May*, 378 Fed. Appx. at 998 ("… all the limitations in a

41

claim must be considered meaningful") *citing Cablestrand*, 29 F.3d 644. The claim includes both footprint and shape and both need to have meaning. Even if footprint means outline or shape, the patentee used the term "footprint shape." If you substitute the proposed construction in, the claim would read "shape shape" or "outline shape." This is nonsensical.

Thus, cancelled Claim 1 and any claims dependent thereon, including, but not limited to asserted Claims 10, 12, 13 and 15 are invalid for indefiniteness under 35 U.S.C. §112.

## CONCLUSION

For the reasons stated herein and in the attached exhibits, Ipe Clip respectfully requests that the Court adopt its proposed constructions.

Dated: May 24, 2019

Respectfully submitted,

/s/ Jennifer L. Friedman
Jennifer L. Friedman, Esq.
Schröder, Joseph & Associates, LLP
392 Pearl Street, Suite 301
Buffalo, New York 14202
Telephone No.: (716) 881-4900
Facsimile No.: (716) 881-4909
jfriedman@sjalegal.com

J. Todd Timmerman
Florida Bar No. 0956058
ttimmerman@slk-law.com
Mindi M. Richter
Florida Bar No. 0044827
mrichter@slk-law.com
Jeffrey B. Fabian
Florida Bar No. 0085868

jfabian@sIk-law.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard, Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.: (813) 229-1660

*Attorneys for Plaintiff The Ipe Clip Fastener
Company, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 24, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic filing to all counsel of record.

/s Jennifer L. Friedman
Attorney
